UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTOPHER ELLIS, | |
| Plaintiff, | No.: 2:26-cv-02041 |
| - against - | **COMPLAINT** |
| NASSAU COUNTY, DETECTIVE RICHARD WELLS, DETECTIVE GEORGE PIERCE, DETECTIVE ROBERT WINTER, DETECTIVE ROBERT J. SHAW, DETECTIVE JOHN COMISKEY, the Estate of DETECTIVE JOHN COMISKEY, and JOHN DOE, as Administrator/Executor of the Estate of DETECTIVE JOHN COMISKEY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

CHRISTOPHER ELLIS, by and through his counsel, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, alleges as follows:

### PRELIMINARY STATEMENT

1. At the age of 20, Christopher Ellis was tried and convicted for a tragic murder that he did not commit.

2. On August 9, 2021, after over 30 years—11,133 days—in prison for a crime he did not commit, Mr. Ellis walked out of court into the arms of his wife, son, family, and friends.

3. Mr. Ellis was convicted as a result of a series of constitutional violations: a coerced confession, a tainted "identification," and serial and severe *Brady* violations, including over 300 pages of exculpatory police notes pointing to at least eleven other murder suspects and four separate confessions.

4. But even after Mr. Ellis's conviction was thrown out, the Nassau County District Attorney's Office ("NCDAO") refused to dismiss the case, retrying Mr. Ellis instead.

5.      On January 24, 2025, Mr. Ellis was acquitted. He walked out of the Nassau County Supreme Court courthouse in Mineola, New York, at long last, a free and exonerated man.

6.      Mr. Ellis suffered indescribable loss and agony as a result of the conduct of the police and the unlawful practices of the County. This lawsuit seeks to provide some measure of accountability and justice as a result of this unjust and wrongful conviction.

## JURISDICTION

7.      This Court has federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, over claims arising under 42 U.S.C. § 1983.

8.      Supplemental jurisdiction over Mr. Ellis's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

9.      Plaintiff has complied with the requirements of New York General Municipal Law Section 50-i. Mr. Ellis served a notice of claim on all defendants on April 23, 2025, within the time required by New York General Municipal Law Section 50-e. More than 30 days have passed since the service of the Notice of Claim.

10.     On November 3, 2025, Mr. Ellis submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

11.     Plaintiff demands a trial by jury.

## VENUE

12.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York, the judicial district in which multiple Defendants reside, where Nassau County conducts its business, and in which all events giving rise to the claim took place.

**PARTIES**

13.    Plaintiff Christopher Ellis is a citizen of the State of New York, residing in Kings County.

14.    Defendant Nassau County (the "County") is a political subdivision of the State, the county where the events in question took place and which oversees the Nassau County Police Department ("NCPD"). The County was the employer of the NCPD Defendants Detective Richard Wells, Detective George Pierce, Detective Robert Winter, Detective Robert J. Shaw, and Detective John Comiskey, and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the NCPD and its employees.

15.    Defendant Detective Richard Wells, at all times relevant to this Complaint, was a duly appointed police officer of the NCPD under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County and the State of New York. At all times relevant to this Complaint, Defendant Wells was acting within the scope of his employment.

16.    Defendant Detective George Pierce, at all times relevant to this Complaint, was a duly appointed police officer of the NCPD under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County and the State of New York. At all times relevant to this Complaint, Defendant Pierce was acting within the scope of his employment.

17.    Defendant Detective Robert Winter, at all times relevant to this Complaint, was a duly appointed police officer of the NCPD under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County and the State of New York. At all times relevant to this Complaint, Defendant Winter was acting within the scope of his employment.

18.     Defendant Detective Robert J. Shaw, at all times relevant to this Complaint, was a duly appointed police officer of the NCPD under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County and the State of New York. At all times relevant to this Complaint, Defendant Shaw was acting within the scope of his employment.

19.     Defendants Detective John Comiskey/the Estate of Detective John Comiskey/John Doe, as Administrator/Executor of the Estate of Detective John Comiskey (collectively, "Defendant Comiskey"), at all times relevant to this Complaint, was a duly appointed police officer of the NCPD under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the County and the State of New York. At all times relevant to this Complaint, Defendant Comiskey was acting within the scope of his employment. Defendant Comiskey died prior to the commencement of this action, on February 15, 2026.[1]

20.     Defendants Wells, Pierce, Winter, Shaw, and Comiskey are hereinafter referred to collectively as the "Detective Defendants."

## FACTUAL ALLEGATIONS

*The Underlying Criminal Case*

21.     On February 15, 1991, Christopher Ellis, then 20 years old, was arrested in Freeport for attempted robbery.

---

[1] As of the date of filing, Defendant Comiskey's family has not yet filed a probate or administration proceeding. For the avoidance of doubt, Plaintiff has also named Defendant Comiskey's Estate and its putative Administrator/Executor as defendants. Plaintiff has contacted the Nassau County Public Administrator to initiate a probate or administration proceeding if necessary and will substitute the Administrator/Executor of the Estate as a defendant upon their appointment. *See* Fed. R. Civ. P. 25.

22.     Soon after his arrest, Mr. Ellis confessed to the attempted robbery, but the police continued to detain and question Mr. Ellis about an unsolved September 29, 1990 murder of Joseph Healy outside an Arby's in Hempstead (the "Arby's Shooting").

23.     After 12 more hours of interrogation and deprivation of food, sleep, and contact with the outside world, Mr. Ellis signed a coerced false statement admitting to participation in the Healy murder.

24.     Shortly after signing the coerced statement, Mr. Ellis recanted.

25.     On March 21, 1991, Mr. Ellis was indicted for second-degree murder, as well as various robbery and weapons charges.

26.     On November 16, 1992, Mr. Ellis's case went to trial. Mr. Ellis admitted involvement in the February 1991 Freeport robbery but denied any involvement in the Arby's Shooting.

27.     On January 13, 1993, Mr. Ellis was convicted of murder in the second degree of Joseph Healy, two counts of attempted robbery in the first degree, two counts of criminal possession of a weapon in the second degree, two counts of criminal possession of a weapon in the third degree, and criminal possession of stolen property in the third degree (collectively, the "Healy Charges").

28.     Mr. Ellis was sentenced to 31 1/3 years to life in prison and a $3,000 civil judgment.

29.     Mr. Ellis appealed his conviction to the Appellate Division, Second Department, which affirmed his conviction on December 11, 1995.[2]

---

[2] *People v. Ellis*, 222 A.D.2d 519, 634 N.Y.S.2d 765 (2d Dep't 1995), *leave to appeal denied People v. Ellis*, 87 N.Y.2d 972, 664 N.E.2d 1264 (1996).

30.     On October 23, 2019, Mr. Ellis filed a CPL § 440 motion challenging his convictions on the basis of recently discovered evidence and *Brady* violations related to the non-disclosure of a single witness, Cynthia Louissaint, who police knew had excluded Mr. Ellis from the scene of the crime.

31.     Defendant Wells personally located and interviewed Ms. Louissaint the day after the Arby's Shooting. Ms. Louissaint's descriptions of the two men involved in the Arby's Shooting were used by investigators to create composite police sketches.

32.     Defendant Wells showed Ms. Louissaint photographs of potential suspects at least twenty-five times, because, according to Defendant Wells, Ms. Louissaint was "in a better position to identify" the perpetrators. Defendant Wells showed Ms. Louissaint photographs of Mr. Ellis numerous times, including after Mr. Ellis had been arrested. Ms. Louissaint recognized Mr. Ellis from the newspaper as one of the men arrested for the Arby's Shooting, and repeatedly told Defendant Wells that Mr. Ellis was *not* one of the men she saw at the scene of the Arby's Shooting. Ms. Louissaint's statements to Defendant Wells repeatedly excluded Mr. Ellis as a suspect.

33.     Defendant Wells did not reveal Ms. Louissaint's statements to Mr. Ellis or his defense counsel.

34.     At a pre-trial suppression hearing, Defendant Wells falsely testified that Ms. Louissaint had not excluded anybody when Defendant Wells questioned her.

35.     At the pre-trial suppression hearing, the Assistant District Attorney acknowledged that an exclusion made by a witness—such as Ms. Louissaint's—would be *Brady* material, but represented, based on Defendant Wells's testimony, that no witness had excluded Mr. Ellis as a suspect.

36.     In the months that followed Mr. Ellis's filing of his CPL § 440 motion, counsel for Mr. Ellis collaborated with the NCDAO Conviction Integrity Bureau as they reviewed Mr. Ellis's convictions. This investigation led to the discovery of over one hundred pages of exculpatory police files—including several murder leads, confessions, sworn statements, and police notes—the NCPD had never disclosed to the Defense, or apparently the NCDAO (the "NCPD Files").

37.     On October 30, 2020, Mr. Ellis filed an amended § 440 motion, adding the NCPD Files-*Brady* violations as a basis for the vacatur of his convictions.

38.     On July 14, 2021, while his § 440 motion was pending, Mr. Ellis appeared before the parole board for the first time. The parole board granted Mr. Ellis's application, setting a release date of November 2, 2021.

39.     On July 23, 2021, Mr. Ellis's § 440 motion was granted based on the NCPD Files-*Brady* violations and his convictions for the Healy Charges were vacated. *See People v. Ellis*, No. 77625N-91, 2021 WL 9848450 (N.Y. Sup. Ct. July 22, 2021).

40.     The court explained that "in reviewing the voluminous documentation and potential leads contained in the memo pad notes, and weighing that against the evidence presented at trial, this Court concludes that had Detective Wells's notes been turned over to the defense in a timely manner, there is a reasonable probability that the outcome would have been different." *Id.* at *8. The court found that "the failure to disclose [the NCPD Files] severely erodes the public's sense of justice in this case." *Id.*

41.     In reaching this conclusion, the court rejected the People's argument that the NCPD Files were not material and that their disclosure would not have changed the outcome of the trial. *Id.* at **6–9. The court found that the Brady material was so significant that "[i]t is clear

that the withholding of this material prevented defendant from being able to develop additional facts that could have aided his defense by establishing alternative theories to support his defense" and that, without these notes, "defendant was deprived of the opportunity to make an informed decision about his best trial strategy." *Id*. at *8.

42.     The court noted that the withheld NCPD Files "indicate[d] at least two identifiable people who claimed to have committed the murder" and "identifying information of various individuals who heard these confessions," which, at a minimum, "would have provided numerous leads for the defendant to develop additional and alternative theories of the case" and "would likely have led to significant additional exculpatory or impeaching evidence." *Id*. at *7. The court also found that the withheld files "could have been used to impeach the detectives regarding investigative steps taken or ignored," noting that "[w]hile some of the leads were addressed in some fashion and witnesses were interviewed, in other cases, there is no indication of any follow-up or investigative steps." *Id*. at *8.

43.     The court concluded that "the trial evidence as a whole . . . was not overwhelming or strong. There was no forensic or physical evidence tying defendant to the crime, and none of the other witnesses present at the time of the shooting"—other than one witness' tainted and mistaken identification, *see infra*—"identified defendant as the one with the shooter or at the scene." *Id.* at *8.

44.     On August 9, 2021, Mr. Ellis was produced to the Nassau County Courthouse for a bail hearing. At the hearing, the court noted that Mr. Ellis had "more than served the sentence for those charges" for which a conviction remained. The People "consent[ed] to the defendant being released in his own custody" and the court released Mr. Ellis from the courtroom on his own recognizance.

45.    On September 20, 2021, the NCDAO announced that the People had decided to retry Mr. Ellis on the vacated counts. The People's decision was met with "surprise" by the court.

46.    On November 22, 2021, the People provided counsel for Mr. Ellis with automatic discovery before their retrial of Mr. Ellis. Automatic discovery contained another treasure trove of previously hidden *Brady* material. Thirty-one years after the investigation, twenty-nine years after Mr. Ellis's conviction, more than two years after the NCDAO began its reinvestigation, and four months after the court order vacating the conviction, the People for the first time produced a 234-page file titled "Unnamed Homicide Squad investigative file," consisting of NCPD police notes, homicide lead sheets, arrest records, and statements by witnesses and suspects from the NCPD investigation, all pointing to additional leads and suspects never before disclosed, as well as further information about leads, suspects, and witnesses first disclosed in 2020 (the "Unnamed Homicide File").

47.    On January 24, 2025, after a week-and-a-half long trial, a jury acquitted Mr. Ellis of all charges. The indictment was dismissed accordingly.

### Mr. Ellis's Proof of Innocence

48.    The facts of the underlying case, the documentary evidence, and the circumstances leading to his arrest show that Mr. Ellis suffered an egregious deprivation of process and miscarriage of justice.

49.    Evidence of Mr. Ellis's innocence includes, *inter alia*: previously-suppressed exculpatory evidence points to other parties responsible for the crime; the one eyewitness relied on by the NCDAO was unreliable, and her eyewitness identification was procured through the

unlawful conduct of the NCPD; Mr. Ellis's confession was false and the product of coercion; and the lack of additional evidence coupled with Mr. Ellis's own alibi evidence.

### 1. *Mr. Ellis's Confession Was False and Coerced*

50. The facts and circumstances of Mr. Ellis's interrogation reflect that the confession police obtained from Mr. Ellis was false.

51. At the time of Mr. Ellis's interrogation on February 15, 1991, he was only 20 years old.

52. The interrogation of Mr. Ellis was conducted by the Detective Defendants, beginning at approximately 6 a.m. and lasting for approximately 13-14 hours.

53. At approximately 6 a.m., Mr. Ellis was lying on a bench, handcuffed to a wall, and attempting to sleep, when Defendant Winter, who began the interrogation, came into the room and shoved him in his chest, preventing him from sleeping.

54. The interrogation took place in two primary locations: (1) in the morning, in a room in the basement of the NCPD precinct in Freeport, with Mr. Ellis handcuffed to a wall; and (2) at approximately 1:30 p.m., after Mr. Ellis was transferred to the Homicide Squad in Mineola, where he was taken to an approximately eight-by-ten room and was handcuffed to a chair.

55. Despite the availability of audio and/or video recording equipment to the Detective Defendants, the policy, practice, or custom of Defendant Nassau County—as followed by its employees, the Detective Defendants—was to ignore best practices for police interrogations and to refuse to use audio and/or video recording equipment to record an interrogation and/or confession.

56.    Throughout the interrogation over the course of 12-13 hours, Mr. Ellis repeatedly asserted his innocence, which the Detective Defendants disregarded. The Detective Defendants repeatedly accused Mr. Ellis of involvement in the murder, threatened Mr. Ellis should he refuse to confess, promised him leniency if he falsely confessed to being involved in the Arby's Shooting, and/or failed to prevent other Detective Defendants from doing so despite having reasonable opportunity to intervene.

57.    The Detective Defendants' numerous threats and promises to Mr. Ellis throughout the day included, but were not limited to: (1) telling Mr. Ellis that he looked like the man in the "Wanted" poster regarding the shooting, despite Mr. Ellis consistently protesting that it was not him and responding that he looked nothing like the guy in the poster; (2) telling Mr. Ellis he was "going to go down for this" and that ostensible witnesses "placed" him at the scene, despite Mr. Ellis consistently maintaining that this was impossible because he was not there; (3) pressuring Mr. Ellis to confess by saying that he needed to "come clean" and "clear his conscience," because there was "no way" that he would get out of the situation, despite Mr. Ellis consistently responding that he had nothing to come clean or clear his conscience about because he had not done anything; (4) telling Mr. Ellis that he would go away for life and that his newborn son would grow up without a father; and (5) promising Mr. Ellis that they would "help" him if he confessed, telling him they would talk to the district attorney to make sure he does not spend life in prison and gets sentenced to less time. The Detective Defendants also denied Mr. Ellis food, water, access to a lawyer, a phone call, and sleep.

58.    The pressure tactics worked, causing Mr. Ellis to confess falsely that he was driving the car to the Arby's Shooting during the morning period of his interrogation. After Defendant Comiskey responded that he wanted to write a statement of confession, Mr. Ellis

immediately recanted, saying he needed to discuss further before writing something he knew was not true. He immediately explained to Defendant Comiskey that he only falsely confessed because the Detective Defendants had promised him leniency and threatened him with life in prison.

59.    Given his recantation, Mr. Ellis was transferred to the Homicide Squad in Mineola in the afternoon, where his interrogation continued for *another* approximately five to six hours, conducted primarily by Defendant Pierce—during which time Mr. Ellis was again not permitted to sleep, eat, or drink anything. At one point during the interrogation in the afternoon, Mr. Ellis asked for some water, which Defendant Pierce refused to give him until the interrogation was complete.

60.    Defendant Pierce, in conducting the afternoon portion of the interrogation, continued to make similar threats and promises of leniency, as described *supra*, over these five to six hours. Mr. Ellis continued to protest and repeatedly asserted his innocence.

61.    Ignoring Mr. Ellis's protestations, Detective Pierce wrote a statement of confession for Mr. Ellis to sign and an addendum to the false statement, both of which included several made-up details about the Arby's Shooting that were untrue, unsupported by any evidence, and contradicted by the accounts of witnesses to the shooting. For example, the false statement included details about Mr. Ellis stealing a car—despite no car ever having been recovered or even reported stolen. The false statement also included fake details about a struggle—during which the victim ostensibly grabbed the shooter's gun and struggled with the shooter prior to being shot—whereas all four eyewitnesses reported that there was no argument or struggle and that the shooting happened in a matter of seconds.

62.     Mr. Ellis signed the false, detective-concocted statement of confession, after having been deprived for over 18 hours of any sleep, food, drink, or phone call. After he did so, the Detective Defendants finally gave Mr. Ellis a slice of pizza to eat and something to drink.

63.     Afterwards, the Detective Defendants came back and told Mr. Ellis that there was a problem with a statement that only had him driving the car to the Arby's and that they needed him to sign an addendum saying he was actually outside of the car and by the bushes near the drive-through window where the shooting took place.

64.     Mr. Ellis again repeated that he had nothing to do with the shooting, but the Detective Defendants did not relent, continuing to pressure and threaten him until he signed the false addendum to the statement of confession, and/or failed to prevent other Detective Defendants from doing so despite having reasonable opportunity to intervene. Again, the false addendum contained fake details about Mr. Ellis ostensibly hearing an argument prior to the shooting and then witnessing a struggle between the shooter and a "tall male white"—all of which, again, was flatly contradicted by all four eyewitnesses' testimonies.

### 2. *Numerous Risk Factors for False Confessions Were Present in Mr. Ellis's Case*

65.     Dr. Brian Cutler, a social and forensic psychologist, testified at Mr. Ellis's second criminal trial as to the risk factors for false confessions that increase the likelihood of a false confession.

66.     Based on his review of case documents and the first trial of Mr. Ellis in 1992, Dr. Cutler opined that several risk factors were present:

> a.     Mr. Ellis's young age, being only 20 years old at the time of the interrogation;
>
> b.     The length of Mr. Ellis's interrogation of approximately 13 to 14 hours;

     c.     Mr. Ellis having gone without food, drink, or sleep throughout the interrogation;

     d.     The interrogation having involved "evidence ploys," namely the Detective Defendants' phony threats of inculpatory evidence against Mr. Ellis;

     e.     The Detective Defendants' promises of leniency if he confessed; and

     f.     The several details included in the written false statement of confession and addendum thereto contradicted by the accounts of witnesses to the Arby's Shooting.

67.     As Dr. Cutler testified at Mr. Ellis's re-trial, the above risk factors create a very substantial risk for false confession.

### 3. *Mr. Ellis's Alibi Evidence*

68.     On February 15, 1991, the date Mr. Ellis signed the false statement of confession and the false addendum, Mr. Ellis was unaware that the Arby's shooting had taken place specifically on September 29, 1990.

69.     When he learned the precise date, Mr. Ellis realized it was the date of his brother's birthday. On September 29, 1990, Mr. Ellis had been at his house all night, at a birthday party for his brother.

70.     Keith Meeks, one of the party organizers and the DJ, testified at both trials that Mr. Ellis was at his brother Paul Ellis's birthday party the entire night. Paul Ellis's girlfriend at the time, Andrea Botway, corroborated Mr. Meeks's testimony at Mr. Ellis's first trial, which was read into the record at Mr. Ellis's re-trial.

**4.  *The Prosecution's Weak Remaining Evidence — a Single, Tainted, Mistaken Eyewitness Identification***

71.     The evidence presented against Mr. Ellis at trial was "not overwhelming or strong." *Ellis*, 2021 WL 9848450, at *8. Other than the above-described false and coerced "confession," the People's evidence consisted solely of one eyewitness identification. *Id*. No fingerprints, surveillance video, forensic or physical evidence whatsoever linked Mr. Ellis to the crime. *Id.*

72.     There were four eyewitnesses to the shooting who, after a long night of drinking and carousing, were at the Arby's drive-through where the shooting occurred.

73.     Three of the witnesses did not identify Mr. Ellis.

74.     The fourth witness was Stephanie Scheele. Ms. Scheele testified at the first criminal trial that she saw two men in the driveway area of the drive-through at Arby's, one of whom had a gun, and the other of whom said, "just do it, just do him," before the gunman shot and killed Mr. Healy.

75.     On the night of the shooting, when questioned by police, the only thing Ms. Scheele was able to remember about the non-gunman was that he was "a male black" and was 5 feet 10 inches.

76.     That night, into the morning, and over the ensuing four and a half months, Defendants Wells and Comiskey showed Ms. Scheele several books of photographs of individuals.

77.     Ms. Scheele was unable to identify anyone in them.

78.     On the evening of February 15, 1991, Defendants Wells and Comiskey came to Ms. Scheele's dorm room to show her photographs again, but this time only showed her a piece of paper with six photographs on it, which included Mr. Ellis.

79.    Ms. Scheele still could not identify anyone, including Mr. Ellis, from the six photographs at this time.

80.    Unsatisfied, Defendants Wells and Comiskey then told her to meet them at the Nassau County Police Department for a lineup procedure. A few hours later, Ms. Scheele entered the lineup room and saw eight men lined up. For approximately five minutes, Ms. Scheele was unable to identify anyone, including Mr. Ellis. After approximately five minutes, Ms. Scheele asked that suspect Number 8, Mr. Ellis—who a few hours earlier she had seen in the photo pack—be instructed to say the words she heard the night of the Arby's Shooting, "just do it, just do him." Ms. Scheele had a visceral reaction to hearing those words being said, and identified Mr. Ellis as the non-gunman present at the Arby's Shooting.

81.    Hearing the words "just do it, just do him" at the lineup was the *first time* since the day of the shooting on September 29, 1990 that Ms. Scheele heard those words again.

82.    Ms. Scheele could not identify anything distinctive or unusual about the voice she heard at the Arby's.

### 5.    *Numerous Risk Factors for Mistaken Identification Were Present in Mr. Ellis's Case*

83.    At the retrial, Dr. Cutler testified as to the risk factors present in Ms. Scheele's purported identification of Mr. Ellis, which significantly increased the likelihood that Ms. Scheele's identification was mistaken:

   a.    The tainted, photo-biased lineup resulting from Ms. Scheele having seen Mr. Ellis in the photo-pack presented by Wells and Comiskey mere hours prior to the lineup;

   b.    The short exposure time, *i.e.*, the mere seconds that Ms. Scheele had during the Arby's Shooting to identify the offender;

c. The extreme stress of the shooting;

d. The "weapon focus" risk factor, *i.e.*, the visual presence of a weapon drawing a witness's focus to the weapon and away from the offender's facial characteristics;

e. The cross-race identification;

f. The offender at the Arby's Shooting that wore a hat, masking certain facial cues, such as the offender's hair and hairline;

g. Ms. Scheele having drank a significant amount of alcohol earlier that evening;

h. The presence of multiple offenders, dividing a witness's attention;

i. The long retention interval at play, causing a decline in memory—*i.e.*, the long length of time between a crime and identification—given that Ms. Scheele's identification was four and a half months after the crime; and

j. The slow speed of identification, *i.e.*, Ms. Scheele taking minutes to make an identification, contrary to research showing that correct identifications tend to take six to eight seconds.

84. As Dr. Cutler testified at Mr. Ellis's retrial, the above risk factors create a very substantial risk for mistaken identification.

**6. *Evidence of Other Likely Perpetrators of the Healy Murder***

85. In addition to the threadbare evidence against Mr. Ellis, the NCPD Files and the Unnamed Homicide File stemming from Detective Wells's files and containing documents from Detectives Wells's and Comiskey's investigation (together, the "NCPD *Brady* Materials")

contained information regarding no fewer than 11 other murder leads, suspects, and witnesses, including in confessions, sworn statements, polygraph results, and police notes.

86.     This information included, for example, a signed statement from a confidential informant stating: "Anthony said to 2 guys walking – what you did at Arby's was fucked up. . . . Anthony said to me . . . this is the N[**] that shot the white guy. The guy was smiling and laughing he said it was nothing . . . His name is William Cain."

87.     As the court explained in vacating Mr. Ellis's conviction based *solely* on the first set of *Brady* materials, the NCPD Files, at a minimum, "would have provided numerous leads for the defendant to develop additional and alternative theories of the case" and "would likely have led to significant additional exculpatory or impeaching evidence." *Ellis*, 2021 WL 9848450, at *7. The Court also found that the withheld files "could have been used to impeach the detectives regarding investigative steps taken or ignored," noting that "[w]hile some of the leads were addressed in some fashion and witnesses were interviewed, in other cases, there is no indication of any follow-up or investigative steps." *Id.* at *8.

88.     Accordingly, though the thirty-year-old leads were cold and stale and made it impossible for Mr. Ellis to pursue them decades later at his retrial—and because, by the time of the retrial, Defendant Wells had significant and advanced health complications, and thus was not present and able to be cross-examined—Mr. Ellis obtained an adverse inference instruction regarding the NCPD *Brady* Materials. The jury was instructed that as a result of the People's failure to disclose this evidence for approximately 30 years, they may infer that if Detective Wells were available to testify, his testimony would have been favorable to the defense.

***Mr. Ellis Has Been Significantly Damaged***

89.     By reason of Defendants' above-described conduct, Mr. Ellis was significantly damaged.

90.     Mr. Ellis is entitled to reasonable and fair damages for, *inter alia*, (1) emotional, physical, and psychological pain and suffering associated with decades of wrongful imprisonment, including but not limited to: loss of family contact, loss of personal development, loss of liberty, and loss of reputation; (2) emotional injury following his release from incarceration; and (3) past lost wages, lost seniority and employment opportunities, future lost wages, plus lost benefits including retirement and pension benefits, all incidental to his unjust conviction and wrongful incarceration.

***Defendant Nassau County's Longstanding Unconstitutional Policy, Practice, and/or Custom***

91.     Before, during, and after the violation of Plaintiff's constitutional rights—including at the time of Mr. Ellis's arrest, first trial, and conviction—Defendant Nassau County had a policy or custom—whether formal or informal, and manifested by repeated decisions of final policymakers, or by the persistent, widespread practices of subordinate law enforcement officers—of using unconstitutional investigative techniques, including coercive interrogation tactics, contaminating identification lineups and coercion of witnesses, the fabrication of inculpatory evidence, and the suppression of exculpatory evidence that must be disclosed under *Brady*.

92.     There are several examples of officer misconduct in Nassau County criminal cases illustrating Defendant Nassau County's policy or custom of the above-described wrongful conduct. These examples stem from criminal proceedings and convictions in the 1980s and 1990s—*i.e.*, before and during the violations of Mr. Ellis's rights—as well as from more recent

proceedings, demonstrating that Defendant Nassau County's policy or custom has continued to this day.

93. For example, in 2014, a jury in this district found in favor of plaintiffs John Restivo and Dennis Halstead against defendants Nassau County and former Nassau County Homicide Detective Joseph Volpe, where the plaintiffs' primary theories were that Detective Volpe had fabricated evidence connecting plaintiffs to a 1984 rape and murder, and had violated his obligations under *Brady* by suppressing material and exculpatory DNA evidence.[3]

94. Similarly, a third individual in connection with the same crime, John Kogut, was ultimately acquitted on re-trial due in large part to Mr. Kogut's central defense theory that Mr. Kogut's confession was coerced by Detective Volpe.[4]

95. In 2022, a court in this district denied summary judgment as to plaintiff Joseph Jackson's 42 U.S.C. § 1983 claims for *Brady* violations, for fabrication of evidence, and for a coerced confession in connection with a 1994 murder.[5] Among other things, Mr. Jackson alleged physical violence and a 39-hour interrogation held in a frigid interrogation room without adequate clothing. Mr. Jackson's claims settled ahead of trial in February 2026.[6]

96. Similarly, plaintiff Josiah Galloway defeated summary judgment motions from individual officers and Nassau County in another case involving allegations of fabricating evidence through, *inter alia*, coercing Mr. Galloway's friend to sign a false statement that Mr. Galloway had confessed to the shooting at issue, contaminating an identification procedure, and

---

[3] *See Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017).
[4] *See* John Kogut, Innocence Project, https://innocenceproject.org/cases/john-kogut/ (last visited Nov. 19, 2025); *People v. Kogut*, 10 Misc. 3d 305, 806 N.Y.S.2d 366 (Sup. Ct., Nassau Cnty. 2005) (allowing social psychologist testimony regarding coerced confessions at re-trial).
[5] *See Jackson v. Nassau Cnty.*, No. 18-CV-3007, 2024 WL 4252047 (E.D.N.Y. Sept. 20, 2024).
[6] *See* Joint Motion to Adjourn, *Jackson v. Nassau Cnty.*, No. 18-CV-3007, Dkt. 470 (E.D.N.Y. June 30, 2025).

failure to disclose *Brady* material related to said coerced statement and contamination.[7] Mr. Galloway's claims are set for trial in January 2027.[8]

97.    In another recent example, plaintiff Darryl T. Coggins defeated summary judgment motions as to his 42 U.S.C. § 1983 claims against Nassau County and various individual officers for false arrest, false imprisonment, malicious prosecution, and *Monell* liability in connection with Mr. Coggins's arrest, incarceration, and indictment for weapons-related charges, which were dropped after an involved officer falsified evidence, gave false testimony, and was ultimately charged with perjury, making a false sworn statement, making a false written statement, and harassment for his false statements made in connection with the arrest and prosecution of Mr. Coggins.[9]

98.    The court also allowed Mr. Coggins's *Monell* claim against Nassau County to proceed to trial, finding, *inter alia*, that "plaintiff's evidence suggests that NCPD's procedures do not allow for adequate investigations, as most complaints are simply reviewed at the command level rather than through Internal Affairs, and no disciplinary action is taken in response to most complaints," that "plaintiff's evidence indicates that Internal Affairs [of the NCPD] opened its investigation into the false statements at issue in this case only in response to prompting by the DA's Office," and that "plaintiff has also produced evidence that NCPD does not adequately discipline its officers for the type of conduct at issue here, based on the lack of repercussions from the complaints that commanding officers deemed 'undetermined' and the relatively lenient

---

[7] *See Galloway v. Cnty. of Nassau*, 141 F.4th 417 (2d Cir. 2025).
[8] *See* Status Report, *Galloway v. Cnty. Oof Nassau*, No. 19-cv-5026, Dkt. 239 (E.D.N.Y. Dec. 22, 2025).
[9] *See Coggins v. Cnty. of Nassau*, 254 F. Supp. 3d 500 (E.D.N.Y. 2017).

penalties [the involved officers] suffered for their false statements in this case."[10] Mr. Coggins's case against Nassau County and its officers settled in 2018.[11]

99.     Beyond these individual cases, further illustrative of the policy and custom permeating Defendant Nassau County—including in the NCPD and NCDAO—is a retrospective law review article from Fred Klein, who served as an Assistant District Attorney in Nassau County for twenty-seven years.[12]

100.    Mr. Klein notes that he "would not be the first to suggest that the failure to disclose exculpatory information results from an office culture that rewards convictions and breeds an attitude that the prosecution is engaged in a battle against the guilty, so the ends justify the means. . . . Since the police have solved the case and the defendant is guilty, any evidence to the contrary is not reliable, and therefore not 'material,' so the rationalization goes."[13]

### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 – Violation of Mr. Ellis's Right Against Self-Incrimination
& Right to a Fair Trial – Fabrication of Evidence/Failure to Intervene – Coerced Confession
(Against the Detective Defendants)

101.    Plaintiff realleges the above paragraphs as if they were fully set forth herein.

102.    The Detective Defendants, acting individually and in concert, coerced Mr. Ellis into making incriminating statements against himself, fabricated evidence, and concealed material exculpatory and impeachment evidence, thereby depriving Mr. Ellis of his Fifth, Sixth, and Fourteenth Amendment rights to be free from self-incrimination and to be provided a fair

---

[10] *Supra* n. 9 at 521.
[11] *See* Stipulation of Dismissal with Prejudice, *Coggins v. Cnty. of Nassau*, No. 07-cv-03624, Dkt. 257 (E.D.N.Y. Sept. 4, 2018).
[12] Fred Klein, *A View from inside the Ropes: A Prosecutor's Viewpoint on Disclosing Exculpatory Evidence*, 38 Hofstra L. Rev. 867 (2010).
[13] *Id.* at 876.

trial, and/or failed to prevent other Detective Defendants from doing so despite having reasonable opportunity to intervene.

103.    Specifically, the Detective Defendants deliberately and recklessly coerced inculpatory statements, and/or failed to prevent other Detective Defendants from doing so despite having reasonable opportunity to intervene, which were not the product of Mr. Ellis's free will and rational intellect, through the use of tactics including: taking advantage of Mr. Ellis's young age; subjecting Mr. Ellis to an interrogation of approximately 13 to 14 hours, without food, drink, or the opportunity to call a lawyer; evidence ploys and threats of incarceration—including threats that Mr. Ellis would not see his family or newborn baby again— with references to false evidence; promises of leniency in exchange for a confession; and in concocting a false written confession that the Detective Defendants coerced Mr. Ellis to sign.

104.    The Detective Defendants falsely represented to prosecutors, and/or failed to prevent other Detective Defendants from doing so despite having reasonable opportunity to intervene, in the course of charging and indicting Mr. Ellis, and at trial, that Mr. Ellis's statements were freely and voluntarily given. The false evidence which the Detective Defendants thereby fabricated was introduced against Mr. Ellis at trial and was a basis for the jury's verdict against him.

105.    The Detective Defendants did not disclose to prosecutors that they obtained Mr. Ellis's confession through coercion.

106.    The Detective Defendants acted under pretense and color of state law.

107.    As a direct and proximate result of the Detective Defendants' actions, Mr. Ellis was wrongly prosecuted, convicted, and imprisoned for over thirty years and suffered other grievous and continuing injuries and damages.

**SECOND CLAIM FOR RELIEF**
42 U.S.C. § 1983 – Violation of Mr. Ellis's Right Against Self-Incrimination
& Right to a Fair Trial – Fabrication of Evidence – Tainted Photo Lineup
(Against Defendants Wells and Comiskey)

108. Plaintiff realleges the above paragraphs as if they were fully set forth herein.

109. Defendants Wells and Comiskey, acting individually and in concert, tainted the photo lineup at which Mr. Ellis was mistakenly identified by Ms. Scheele as the individual involved in the Arby's Shooting who she remembered hearing saying "just do it, just do him," just prior to Mr. Healy being shot.

110. Mere hours before the above-described photo lineup, Defendants Wells and Comiskey visited Ms. Scheele in her dorm room. Diverging from their prior, months-long practice of showing Ms. Scheele scores of suspects in a photo book, they showed her a piece of paper with only six photographs on it, including Mr. Ellis. The detectives did this, at minimum, to prime Ms. Scheele to make a false identification of Mr. Ellis.

111. Ms. Scheele did not identify anyone from the six photographs.

112. Defendant Wells then conducted a photo lineup while Defendant Comiskey waited to interview Ms. Scheele after she viewed the lineup.

113. At the lineup, Ms. Scheele asked only Mr. Ellis to say the words "just do it, just do him," and could not explain why he was the only man of the eight in the lineup she asked to do so, beyond him having "stirred a memory."

114. Of the eight men in the lineup, only *Mr. Ellis* had been previously shown to Ms. Scheele hours earlier by Defendants Wells and Comiskey in Ms. Scheele's dorm room. Ms. Scheele acknowledged at trial that she identified from the lineup the one person she had previously seen a few hours prior, in the photo pack shown to her by Defendants Wells and Comiskey.

115.    As Dr. Cutler explained at trial, the most important risk factor leading to Ms. Scheele's mistaken identification of Mr. Ellis was the "photo-biased lineup"—the phenomenon in eyewitness psychology that whenever a witness sees a suspect between the crime and the lineup identification, contamination occurs, whereby seeing the suspect shortly beforehand contaminates the subsequent identification.

116.    The contamination of the lineup deliberately and recklessly caused by Defendants Wells and Comiskey rendered it unlikely that Ms. Scheele's identification from the lineup would be a result of her memory of the actual offender, rather than her mistaken sense of familiarity with Mr. Ellis based on having seen a photo of him a few hours before the lineup.

117.    Defendants Wells and Comiskey then forwarded this fabricated evidence to the district attorney and it became a critical part of the People's evidence at trial.

118.    In violation of the Fifth and Fourteenth Amendments, through the foregoing conduct, Defendants Wells and Comiskey fabricated evidence of an identification contaminated by their deliberate and reckless conduct. Other than the coerced confession described *supra*, Ms. Scheele's mistaken and contaminated identification was the sole piece of evidence against Mr. Ellis at his first trial.

119.    Defendants Wells and Comiskey acted under pretense and color of state law.

120.    As a direct and proximate result of Defendants Wells's and Comiskey's actions, Mr. Ellis was wrongly prosecuted, convicted, and imprisoned for over thirty years and suffered other grievous and continuing injuries and damages.

### THIRD CLAIM FOR RELIEF
42 U.S.C. § 1983 – *Brady* – Withholding Material Exculpatory Evidence – Louissaint Exclusion
(Against Defendant Wells)

121.    Plaintiff realleges the above paragraphs as if they were fully set forth herein.

122.    Defendant Wells showed Ms. Louissaint photographs of Mr. Ellis several times and was repeatedly informed by Ms. Louissaint that she recognized Mr. Ellis and that Mr. Ellis was *not* one of the individuals at the scene of the Arby's Shooting.

123.    Ms. Louissaint's repeated exclusions of Mr. Ellis as a suspect were and are material exculpatory evidence under *Brady*. Had they been disclosed to Plaintiff, there would have been at least a reasonable probability of a different outcome at his trial.

124.    Defendant Wells was aware of Ms. Louissaint's statements excluding Mr. Ellis.

125.    Defendant Wells had a duty to give material exculpatory evidence to the prosecution so it could be disclosed to the defense.

126.    Defendant Wells did not inform the prosecution of Ms. Louissaint's statements excluding Mr. Ellis, instead concealing that information by falsely testifying at a pre-trial suppression hearing that no witness to the Arby's Shooting had excluded Mr. Ellis.

127.    As described *infra*, Defendant Wells failed to disclose other *Brady* material to the prosecution and to the defense as well.

128.    Defendant Wells's above-described conduct deprived Mr. Ellis of his rights under the Constitution and the laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

129.    Defendant Wells acted under pretense and color of state law. He acted with the specific intent to deprive Plaintiff of his constitutional rights.

130.    As a direct and proximate result of Defendant Wells's actions, Mr. Ellis was wrongly prosecuted, convicted, and imprisoned for over thirty years and suffered other grievous and continuing injuries and damages.

**FOURTH CLAIM FOR RELIEF**
42 U.S.C. § 1983 – *Brady* – Withholding Material Exculpatory Evidence – Third-Party
Culpability
(Against Defendants Wells and Comiskey)

131.   Plaintiff realleges the above paragraphs as if they were fully set forth herein.

132.   Defendants Wells and Comiskey withheld hundreds of pages of exculpatory information—including no fewer than 11 other murder leads, suspects, and witnesses, including in confessions, sworn statements, polygraph results, and police notes—in the NCPD *Brady* Material.

133.   As the court explained in vacating Mr. Ellis's convictions based *solely* on the NCPD Files (the first set of *Brady* material), this withheld information, at a minimum, "would have provided numerous leads for the defendant to develop additional and alternative theories of the case" and "would likely have led to significant additional exculpatory or impeaching evidence." *Ellis*, 2021 WL 9848450, at *7. The court also found that the withheld files "could have been used to impeach the detectives regarding investigative steps taken or ignored," noting that "[w]hile some of the leads were addressed in some fashion and witnesses were interviewed, in other cases, there is no indication of any follow-up or investigative steps." *Id.* at *8.

134.   As the court found, the NCPD Files are undoubtedly material exculpatory evidence under *Brady*. As the court found, had they been disclosed to Plaintiff, there would have been at least a reasonable probability of a different outcome at his trial.

135.   The same analysis applies to the Unnamed Homicide File—produced to Mr. Ellis only *after* his convictions were vacated—which contained similar information as the NCPD Files that is material exculpatory evidence under *Brady*. Had they been disclosed to Plaintiff, there would have been at least a reasonable probability of a different outcome at his trial.

136.    The police notes and other documents in the NCPD *Brady* Material stemmed from Defendants Wells's and Comiskey's investigation into the Arby's Shooting. Defendants Wells and Comiskey were aware of the NCPD *Brady* Material containing materially exculpatory evidence under *Brady*.

137.    Defendants Wells and Comiskey had a duty to give material exculpatory evidence to the prosecution so it could be disclosed to the defense, but failed to do so, instead concealing the NCPD *Brady* Material.

138.    Defendants Wells's and Comiskey's above-described conduct deprived Mr. Ellis of his rights under the Constitution and the laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

139.    Defendants Wells and Comiskey acted under pretense and color of state law. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

140.    As a direct and proximate result of Defendants Wells's and Comiskey's actions, Mr. Ellis was wrongly prosecuted, convicted, and imprisoned for over thirty years, and suffered other grievous and continuing injuries and damages.

**FIFTH CLAIM FOR RELIEF**
42 U.S.C. § 1983 – Malicious Prosecution
(Against Defendants Wells & Pierce)

141.    Plaintiff realleges the above paragraphs as if they were fully set forth herein.

142.    Defendants Wells and Pierce, despite knowing that probable cause did not exist to arrest and prosecute Mr. Ellis for the Healy Charges, and though any probable cause determination was vitiated by their undisclosed misconduct, coerced confession, and fabrication

of evidence, acted individually and in concert to cause Mr. Ellis to be wrongfully prosecuted for the Healy Charges, in violation of the Fourth and Fourteenth Amendments.

143.    Specifically, on February 16, 1991, Detective Pierce prepared and Detective Wells signed a sworn felony complaint, formally initiating the prosecution against Mr. Ellis.

144.    Defendants Wells and Pierce lacked probable cause to initiate the prosecution of Mr. Ellis and the indictment and conviction of Mr. Ellis was procured by fraud, perjury, and presentation of fabricated evidence.

145.    Defendants Wells and Pierce gave the prosecution and the Grand Jury fabricated evidence, including a coerced confession and a contaminated lineup identification.

146.    Defendants Wells and Pierce acted with malice and knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest, indict, and prosecute Mr. Ellis for the Healy Charges.

147.    Defendants Wells and Pierce prosecuted Mr. Ellis though they knew that the only evidence against him was his confession, which they had coerced, and Ms. Scheele's identification of him, which Defendants Wells and Comiskey contaminated. No evidence connected Mr. Ellis to the Arby's Shooting other than the coerced confession and contaminated identification.

148.    The proceeding was terminated in Mr. Ellis's favor on January 24, 2025, when a jury acquitted Mr. Ellis on all charges, and the indictment was dismissed accordingly.

149.    Defendants Wells's and Pierce's above-described conduct deprived Mr. Ellis of his rights under the Constitution and the laws of the United States.

150.    Defendants Wells and Pierce acted under pretense and color of state law. They acted with the specific intent to deprive Plaintiff of his constitutional rights.

151.    As a direct and proximate result of Defendants Wells's and Pierce's actions, Mr. Ellis was wrongly prosecuted, convicted, and imprisoned for over thirty years, and suffered other grievous and continuing injuries and damages.

## SIXTH CLAIM FOR RELIEF
Common Law Malicious Prosecution
(Against Defendant Nassau County)

152.    Plaintiff realleges the above paragraphs as if they were fully set forth herein.

153.    Defendants Wells and Pierce, despite knowing that probable cause did not exist to arrest and prosecute Mr. Ellis for the Healy Charges, and though any probable cause determination was vitiated by Defendants Wells and Pierce's undisclosed misconduct, coerced confession, and fabrication of evidence, acted individually and in concert to cause Mr. Ellis to be wrongfully prosecuted for the Healy Charges.

154.    Specifically, on February 16, 1991, Detective Pierce prepared and Detective Wells signed a sworn felony complaint, formally initiating the prosecution against Mr. Ellis.

155.    Defendants Wells and Pierce lacked probable cause to initiate the prosecution of Mr. Ellis and the indictment and conviction of Mr. Ellis was procured by fraud, perjury, and presentation of fabricated evidence.

156.    Defendants Wells and Pierce gave the prosecution and the Grand Jury fabricated evidence, including a coerced confession and a contaminated lineup identification.

157.    Defendants Wells and Pierce acted with malice, and knew or were deliberately and recklessly indifferent to the truth that probable cause did not exist to arrest, indict, and prosecute Mr. Ellis for the Healy Charges.

158.    Defendants Wells and Pierce prosecuted Mr. Ellis though they knew the only evidence against him was his confession, which they had coerced, and Ms. Scheele's

identification of him, which Defendants Wells and Comiskey contaminated. No evidence connected Mr. Ellis to the Arby's Shooting other than the coerced confession and contaminated identification.

159.    The proceeding was terminated in Mr. Ellis's favor on January 24, 2025, when a jury acquitted Mr. Ellis on all charges, and the indictment was dismissed accordingly.

160.    Mr. Ellis is in fact innocent and there is overwhelming evidence of Mr. Ellis's innocence, as reflected in his acquittal.

161.    Defendants Wells and Pierce acted under pretense and color of state law and within the scope of their employment as employees of Nassau County.

162.    Defendant Nassau County, as employer of Defendants Wells and Pierce, is responsible for Defendants Wells and Pierce's wrongdoing under the doctrine of *respondeat superior*.

163.    As a direct and proximate result of Defendants' actions, Mr. Ellis was wrongly prosecuted, convicted, and imprisoned for over thirty years, and suffered other grievous and continuing injuries and damages.

### SEVENTH CLAIM FOR RELIEF
42 U.S.C. § 1983 – Municipal Liability Under *Monell* – Fifth, Sixth, and Fourteenth Amendments – Policy and Custom of Coercive Police Interrogation and Investigative Techniques, Fabricated Evidence, and Withholding of Exculpatory Evidence
(Against Defendant Nassau County)

164.    Plaintiff realleges the above paragraphs as if they were fully set forth herein.

165.    Before, during, and after the violation of Plaintiff's constitutional rights— including at the time of Mr. Ellis's arrest, first trial, and conviction—Defendant Nassau County had a policy or custom of unconstitutional investigative techniques, including coercive

interrogation tactics, contaminating identification lineups and coercion of witnesses, the fabrication of inculpatory evidence, and the suppression of exculpatory evidence.

166.    Defendant Nassau County was aware of, permitted, tolerated, and/or was deliberately indifferent to the Detective Defendants' coercive techniques, fabrication of evidence, and withholding of evidence.

167.    At the time of Mr. Ellis's arrest, trial, and conviction, Defendant Nassau County had a custom and practice not to internally investigate, reprimand, sanction or discipline detectives for misconduct, including *Brady* violations and coercive interrogation tactics.

168.    Defendant Nassau County's custom and practice encouraged, condoned, and ratified the Detective Defendants' deliberate and reckless disregard of their constitutional duties. Policymakers of Defendant Nassau County, acting with deliberate indifference to the above-described constitutional violations, including those that injured Plaintiff, failed to take any steps to protect against constitutional harms certain to occur without policies, practices, or procedures in place to prevent, address, or punish officer misconduct.

169.    To the contrary, the deliberate indifference and policies and practices of Defendant Nassau County policymakers created a culture of officer misconduct that they knew was highly likely to result in further violations and which, in fact, did so in numerous cases, including Plaintiff's case.

170.    The Detective Defendants acted consistently with and pursuant to Nassau County policy or custom when they engaged in their conduct set forth above, including but not limited to withholding valuable *Brady* material, making false statements in open court that no exclusions had been made by witnesses, contrary to Ms. Louissaint's exclusion, and in using coercive interrogation tactics.

171.    Defendant Nassau County, acting under color of state law, violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

172.    As a direct and proximate result of Defendant Nassau County's policy or custom, Plaintiff suffered the damages alleged herein. These unlawful policies, practices, procedures, and/or customs of Defendant Nassau County were a substantial factor in bringing about the violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.    Compensatory damages against all Defendants in an amount to be determined at trial;

b.    Punitive damages against the Detective Defendants in an amount to be determined at trial;

c.    Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

d.    Such other and further relief as this Court may deem just and proper.

Dated: April 7, 2026             EMERY CELLI BRINCKERHOFF
      New York, New York       ABADY WARD & MAAZEL LLP

                              /s/ *Eric Abrams*

                       Ilann M. Maazel
                       Earl S. Ward
                       Jonathan S. Abady
                       Vivake Prasad
                       Eric Abrams

                       1 Rockefeller Plaza, 8th Floor
                       New York, New York 10020
                       (212) 763-5000

                       *Attorneys for Christopher Ellis*